UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
CHRISTINA TUEROS and HERMEL LOPEZ,          :          21-CV-4525 (JMF) (RWL)
on behalf of themselves, the FLSA Collective,       :
and the Class,                                                          :
                                                                        :          **DECISION AND ORDER:**
                                        Plaintiffs,        :          **MOTION FOR**
                                                                        :          **CONDITIONAL CERTIFICATION**
                                                                        :
                        - against -                               :
                                                                        :
URBAN HEALTH PLAN, INC.,                              :
                                                                        :
                                        Defendant.      :
------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 7/14/2022

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiffs filed this action against Urban Health Plan, Inc. ("Defendant" or "Urban") the not-for-profit owner and operator of a network of medical, dental, and mental health facilities serving more than 90,000 patients in the New York City area.  Plaintiffs, employees of Urban, claim that the company has violated the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"), primarily through a common policy of not paying non-managerial employees for work performed prior to or after their shifts and during mealtime.   Before the Court is Plaintiffs' motion for an order (1) conditionally certifying the FLSA claims as a collective action pursuant to 29 U.S.C. § 216(b); (2) requiring Urban to provide Plaintiffs with a list containing contact and other information of all non-managerial individuals employed by Defendants for the last six years; (3) approving Plaintiff's proposed form and manner of notice to potential opt-in members of the collective action; and (4) equitably tolling the statute of limitations for potential opt-in plaintiffs.  For the reasons that follow, Plaintiff's motion is GRANTED in part and DENIED in part.

**Factual Background**[1]

### A.   Urban

Urban is a New York not-for-profit corporation providing medical and dental health services to patients regardless of their ability to pay.  It operates 11 clinical sites, a mental health facility, 12 school-based sites, and six administrative and program sites.  In 2019, Urban served more than 90,000 patients.  (Pl. Mem. Ex. B. at 3.[2])  Most of Urban's facilities are located in the Bronx, New York; it also provides services in Central Harlem and Corona, Queens.  (Compl. ¶ 7; Lopez Decl. ¶ 1.)

Urban's facilities operate as a common integrated enterprise.[3]  (Compl. ¶ 8.)  Urban operates each of the facilities, and each location is identified as a division of Urban; Urban locations are advertised jointly on its website; all locations use the same patient portal; Urban

---

[1] The factual background is drawn from the Complaint filed May 19, 2021 (Dkt. 1) ("Compl."); the declarations of Plaintiffs' attorney C.K. Lee filed September 3, 2021 (Dkt. 19) ("First Lee Decl."); February 18, 2022 (Dkt. 46) ("Second Lee Decl."); and June 3, 2022 (Dkt. 61) ("Third Lee Decl."), and the declarations of Christina Tueros (Dkt. 20) ("Tueros Decl."), Hermel Lopez (Dkt. 21) ("Lopez Decl."), Diana Rodriquez (Dkt. 22) ("Rodriquez Decl."), all filed September 3, 2021; and the declaration of Arthur Robb, Defendants' attorney (Dkt. 40) ("Robb Decl."); and all exhibits thereto.  Five of the exhibits attached to the Robb declaration are declarations of Urban managers who attest to company policies and managerial practices.  They are cited herein by their ECF Docket number as Robb Decl., Exs. Dkt. 40-18 through 40-22.  Three of the Robb exhibits – Dkts. 40-E, 40-F, and 40-G – are deposition transcripts respectively for Tueros, Lee, and Rodriguez and are cited herein as "Tueros Depo.," "Lee Depo.," and "Rodriguez Depo."  The sole exhibit to the Second Lee Declaration (Dkt. 61-1) is the deposition transcript for Urban employee Candida Baez ("Beaz Depo.").

[2] A citation following multiple sentences without citation supports the assertions in each preceding sentence.

"Pl. Mem." refers to Memorandum Of Law In Support Of Plaintiff's Motion For Conditional Collective Certification at Dkt. 18.

[3] "Whether a group of entities qualifies as a single integrated enterprise turns on four factors: '(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.'"  *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp.3d 99, 133 (S.D.N.Y. 2020) (quoting *Brown v. Dikin Americas, Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

maintains centralized labor relations and human resources; all locations implement the same wage and hour policies and procedures established by Urban; Urban employees work at multiple locations; and all employees use the same centralized time-keeping and payroll system known as "Paylocity."  (Pl. Mem. Exs. B-G.)

As Urban notes, "[a]ll employees are required to utilize Paylocity in accordance with Urban's processes."  (Def. Opp. 4.[4])  Urban also requires that an employee obtain pre-approval from their supervisor for work performed either before or after their scheduled shift.  (Robb Decl. Ex. Dkt. 40-10 at 170.)

**B.    Plaintiffs**

Plaintiff Lopez was employed by Urban as a handyman.  He started in February 2017 and, at least as of September 3, 2021, was still an employee.  Although predominantly hired for Urban's Plaza Del Sol location in Corona, he routinely transferred between many of Urban's other locations.  (Lopez Decl. ¶¶ 1, 3.)  Lopez was paid an hourly rate and worked an average of 54 hours per week.  (Lopez Decl. ¶¶ 4-5.)

Plaintiff Tueros was employed by Urban from November 2014 to November 2019.  She started worked as a receptionist at the Plaza Del Sol location, and later as a Patient Service Representative, and then as a Community Health Worker at one of Urban's locations in the Bronx.  (Tueros Decl. ¶ 1.)  Tueros received an hourly pay rate and, for a period of time worked an average of 58 hours per week, and later 46 hours per week.  (Tueros Decl. ¶ 5.)

Diana Rodriguez was employed by Urban as a phlebotomist from June 2013 to June 2019 at its Plaza Del Sol location.  (Rodriguez Decl. ¶ 1.)  She was paid on an hourly basis and typically worked over 40 hours per week.  (Rodriquez Decl. ¶¶ 5-6.)  Although she is not a plaintiff in the instant case, Rodriguez is a plaintiff against Urban in a parallel state court action

---

[4] "Def. Opp." refers to Defendants' Memorandum Of Law In Opposition To Plaintiff's Motion For Conditional FLSA Certification at Dkt. 39.

asserting the same claims as here.  (*See* Robb Decl. Ex. B.)  For convenience, the Court refers to Rodriguez as one of the "Plaintiffs" along with Tueros and Lopez.

**C.     Plaintiffs' Uncompensated Work Time**

Plaintiffs each assert that they were subject to certain common pay practices that resulted in not being paid for all their work.  Specifically, they assert that they were not paid for work performed before and after their shifts, and during lunch time.[5]  As Lopez explains, "I typically worked more than [my] scheduled hours because I was required to: (1) … come in prior to my work to participate in our daily scheduling of duties, conduct a visual inspection of premises and test medical units, but I was not compensated until my shift was scheduled to begin, (2) work through lunch due, in part to understaffing and the workload demanded of individual employees, but Defendant deducted a meal [hour] from my time even on days I had to skip lunch entirely, and (3) asked to complete additional assignments after signing out, … but I did not receive pay for that time."  (Lopez Decl. ¶ 5; *see also* Tueros Decl. ¶¶ 4, 6; Rodriquez Decl. ¶¶ 5, 7-9.)

Plaintiffs also each attest to discussions with other Urban employees subject to the same pay practices.  Lopez identifies the name (either first or both first and last) and position of 11

---

[5] In addition to claiming time-shaving, Plaintiffs describe certain other ways in which Urban allegedly violated the labor laws, including: (1) failure to pay "spread-of-hours" for days they worked more than ten hours (Tueros Decl. ¶ 8, Rodriguez Decl. ¶ 15); (2) failure to provide a requisite "wage notice" (Lopez Decl. ¶19, Tueros Decl. ¶ 12, Rodriguez Decl. ¶ 18); (3) failure to reimburse for uniforms or vehicle expenses (Lopez ¶ 14, Rodriquez Decl. ¶ 14); and (4) "intermittently, for approximately fifteen … paychecks a year," pay on a "straight-time" basis for all hours worked.  (Tueros Decl. ¶ 7).  Those allegations do not merit much analysis.  Indeed, the parties do not discuss them at all in their certification briefing.  The first two items ("spread-of-hours" and "wage notice") are requirements of the NYLL, not the FLSA.  And, at least based on the evidence currently before the Court, the second two items (non-reimbursement and intermittent payment on straight-time basis) are not sufficiently supported with non-conclusory evidence to demonstrate that those issues were the subject of a common policy or practice or otherwise a material issue of fact or law common among all putative plaintiffs.  *See Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 516 (2d Cir. 2020) (discussed below in context of standards for conditional certification of a collective FLSA action).

other employees with whom he spoke, and, in some instances saw, complain to their manager, about the same pay practices.  (Lopez Decl. ¶ 6.)  Lopez also recounts specific examples in which he and other colleagues were not paid for off-the-clock work and complained to their manager.  (Lopez Decl. ¶¶ 11-12.)  Tueros identifies four colleagues by their first name and position, all who worked at the Plaza Del Sol location like her and were not paid for work performed during lunch breaks.  (Tueros Decl. ¶¶ 2-4.)  Similarly, Rodriguez identifies eight co-workers by first or both first and last name and their positions, all who mostly or entirely worked at the Plaza Del Sol location.  (Rodriquez Decl. ¶ 3.)  Rodriquez describes in particular the circumstances in which she observed or heard directly from three other employees that they had the same complaints about Urban's pay practices.  (Rodriquez Decl. ¶¶ 9-11; *see also* Tueros Decl. ¶ 4.)

Based on information obtained during discovery and compiled by Plaintiff, Plaintiffs have submitted time and pay data that appear to corroborate the practices described by Plaintiffs. The data is presented in the form of side-by-side comparison of each day's actual work time against compensated time, along with a total of all uncompensated hours.  For Lopez and Tueros, the data submitted is for each October that they worked.  The data for Lopez reflects 13.04 unpaid hours cumulative for four Octobers, or 3.26 uncompensated hours per month.[6] The data for Tueros reflects 25.33 unpaid hours cumulative for three Octobers, or 8.44 uncompensated hours per month.   (Pl. Mem. 8 and Exs. J, K.[7])   For Rodriquez, the data submitted is every day from May 19, 2015 through June 17, 2019.  That data indicates that

---

[6] The Lopez data does not include October 2018.  No explanation has been provided as to why.

[7] The three spreadsheet exhibits do not explicitly identify which corresponds to which Plaintiff. Based on the years of data presented, however, the Court has matched each exhibit with each Plaintiff.  Pl. Mem. Ex. J pertains to Tueros; Ex. K pertains to Lopez; and Ex. L pertains to Rodriquez.

Rodriguez worked a total of 257.66 uncompensated hours over that 49-month period, or approximately 5.26 uncompensated hours per month.[8]  (Pl. Mem. 8 and Ex. L.)

Plaintiffs attribute their plight to managers who required them to work off the clock, as well as Urban's implementation of the Paylocity time system.  As for the former, each of the Plaintiffs assert that they and co-workers were required to start work early but not clock in; work during or through lunch; and engage in off-the-clock work after the end of their shift, even after clocking out.  (Lopez Decl. ¶¶ 5, 10-13; Tueros Decl. ¶¶ 3-4; Rodriguez Decl. ¶¶ 5, 7.)

D.    **Paylocity**

As for the time-keeping system's operation, Plaintiffs provide the following undisputed description.  With respect to unregistered pre-shift work, "[w]hen employees clocked in for work prior to the start of their shift, Defendant's time keeping device would only start registering their compensable hours after their shift was scheduled to begin."  (Pl. Mem. 9.)   In contrast, "Defendant's time keeping system would stop registering their compensable hours at the time their shift was scheduled to end," even if the employee continued to work.  (Pl. Mem. 11.)  With respect to mealtime, "[o]n days employees clocked-in/out for lunch, if the employee[']s lunch break registered for less than an hour, Defendant still deducted an hour from employees' compensable time.  … [O]n days employees' lunch break was more than an hour, Defendant would deduct more than an hour for lunch.  Moreover, on days employees were unable to have lunch and did not clock-in or out, Defendants still deducted an hour."  (Pl. Mem. 10.)

---

[8] The time data, if proven to be representative of other months and time-periods, demonstrates that each Plaintiff's estimate of the hours they worked each week but for which they were not paid is significantly overstated.  As attested to in their declarations, and depending on their particular situation, each Plaintiff incurred about 3 to 4 hours of unpaid work per week due to automatic mealtime deductions; about 2 to 3 hours per week due to uncompensated pre-shift work; and about 1 to 3 hours per week for uncompensated post-shift work.  (Lopez Decl. ¶¶ 10-12; Tueros Decl. ¶ 4, Rodriguez Decl. ¶¶ 7-9.)  Taken together, those amounts total 6 to 10 hours of work each week – or 24-40 hours per month – for which each Plaintiff purportedly was not paid.  The actual data is indicative of far fewer uncompensated hours of, depending on the Plaintiff, 3.26 to 8.44 hours per month.

Assuming an employee properly clocks (also referred to as "punches") in when they begin work and clock out when they stop work, the Paylocity system tracks employee hours and provides Urban with knowledge of whether an employee has worked hours outside of their regular shift.  The Paylocity system is pre-loaded with each employee's scheduled hours (Def. Opp. 5.) but, again assuming that an employee properly clocks in and clocks out, captures "all of the employee's time on the premises – whether working time or not."  (Def. Opp. 4; Robb Decl., Ex. Dkt. 40-10 at 170.)  Urban managers regularly review Paylocity data to determine if there are variances between their employee's punched time and scheduled time.  (Robb Decl., Ex. Dkt. 40-11 at 177; Ex. Dkt. 40-19 ¶ 6; Ex. Dkt. 40-20 ¶¶ 8-9; Ex. Dkt. 40-21 ¶ 4.)  Managerial review involves checking each employee's time punches for completeness and ensuring that any variance between the scheduled hours and punched hours are explained, documented, and approved where appropriate.  (Robb Decl., Ex. Dkt. 40-20 ¶¶ 8-9; Ex. Dkt. 40-21 ¶¶ 3-5.)

Apart from managerial review, the Paylocity system enables an employee to explain discrepancies between their clock punch times and their scheduled times by using Paylocity's Employee Comments feature.  (Robb Decl., Ex. Dkt. 40-11 at 176; Ex. Dkt. 40-20 ¶ 7; Ex. Dkt. 40-22 ¶ 3.)  Additionally, Paylocity allows employees to review and approve their electronic timecard before it is submitted for processing.  (*See* Robb Decl., Ex. Dkt. 40-10 at 170; Ex. Dkt. 40-11 at 177.)  Employees are trained on how to use the Paylocity system during employee orientation.  (Robb Decl., Dkt. 40-18 ¶ 6; Ex. Dkt. 40-19 ¶¶ 2-3; Ex. Dkt. 40-22 ¶ 4.)

### Procedural Background And The Instant Motion

Plaintiffs filed their Complaint on May 19, 2021.  (Dkt. 1.)  Defendant answered on July 28, 2021.  (Dkt. 13.)  The Complaint alleges that Defendants had a policy of shaving time from non-managerial employee's pay and required them to perform unpaid off-the-clock work in violation of both the NYLL and FLSA.  Plaintiffs seek to recover damages and other relief as

permitted by the labor statutes.  Plaintiffs also seek certification of the case as both a class action pursuant to Federal Rule of Civil Procedure 23 and as a collective action pursuant to the FLSA.

Plaintiffs filed the instant motion on September 3, 2021 to conditionally certify a collective action for their FLSA claims.  The motion papers include a Memorandum Of Law In Support (Dkt. 18) ("Pl. Mem."), as well as declarations from Christina Tueros (Dkt. 20), Hermel Lopez (Dkt. 21), and Diana Rodriquez (Dkt. 22).  In opposition, Defendants filed a Memorandum Of Law (Dkt. 39) ("Def. Opp."), along with the Declaration of Arthur Robb, Defendants' attorney (Dkt. 40).  The exhibits to the Robb declaration include several additional declarations from Urban managerial employees, including Kevin Oria, a payroll manager; Jeanette Melendez, Associate Vice-President for Health Center Operations; Duarna Oller, supervisor at one of Urban's facilities; Sherrie Ann Young, Senior Administrator for Health Center Operations who supervisors employees at another one of Urban's facilities; and Candida Baez, Manager in the Specialty Department at yet another of Urban's facilities.[9]

Plaintiffs filed a Reply Memorandum Of Law (Dkt. 45) ("Reply") on February 18, 2022, accompanied by a second declaration from Plaintiffs' attorney, C.K. Lee, providing certain updated exhibits (Dkt. 46).  At the same time, Plaintiffs requested the opportunity to take depositions of the present and former employee declarants on whom Urban intended to rely and then file an additional reply based on discovered information.  (Dkt. 47.)  The Court granted that request.  (Dkt. 53.)  Of the five employee declarants on whom Urban relies in opposition to the instant motion, Plaintiffs took the deposition of only Candida Baez, deciding that depositions of the other managerial employees were not necessary.  On June 3, 2022, Plaintiffs filed their

---

[9] The Robb Declaration also attached several declarations of present or former non-managerial employees on which Urban ultimately decided not to rely for purposes of opposing the instant motion.  (Dkt. 55.)

supplemental reply, which they style as a sur-reply (Dkt. 60) ("Pl. Supp."), and a third declaration of C.K. Lee, attaching the transcript of the Baez deposition (Dkt. 61).

On July 5, 2022, Defendants filed a sur-reply brief in response to Plaintiffs' supplemental reply (Dkt. 64) ("Def. Supp."). At that juncture, the motion was fully briefed. The case has been referred to me for general pre-trial purposes, including non-dispositive motions such as the instant application. (Dkt. 48.)

In addition to moving for conditional certification of an FLSA collective action, Plaintiffs request that the Court approve the notice and "opt-in" form to be sent to prospective members of the collective. Defendants contend that no notice should be issued because the case does not qualify for certification as a collective action, but even if it did, the notice is overbroad, particularly with respect to the time-period it covers. Plaintiffs also seek production of employee contact information; again, Defendants contend that no discovery is warranted, but even if it were, the information sought by Plaintiffs is overbroad and invasive. Finally, Plaintiffs request that the Court invoke equitable tolling of the statute of limitations until such time as potential opt-in plaintiffs are notified of the collective action. Defendants oppose, arguing that there are no exceptional circumstances warranting application of the equitable tolling doctrine.

## I.      Conditional Certification Is Warranted

Plaintiffs seek certification of a collective that would include all non-managerial employees of Urban for the relevant time-period, including but not limited to phlebotomists, nurses' aides, technicians, patient service representatives, therapists, community health workers, handymen, and janitors. Plaintiffs' motion is premised on Urban's alleged implementation of two wrongful pay policies: (1) failing to pay employees for all hours worked by "surreptitiously deducting compensable time from employees' clocked-in hours," and (2) "requiring employees to engage in off-the-clock work" before and after their shifts and during

mealtime.  (Pl. Mem. at 7.)  The following discussion begins with an explanation of collective actions, the two-step process for certifying a collective action, and the standards a plaintiff must meet to warrant conditional certification.  Applying those principles, the Court finds that the requirements for conditional certification are met.

## A.    The FLSA And Section 216(b) Collective Actions

The FLSA was enacted to remediate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. § 202(a).  "Among the bedrock principles of the FLSA is the requirement that employers pay employees for all hours worked."  *Foster v. City of New York, New* York, No. 14-CV-4142, 2017 WL 11591568, at *17 (S.D.N.Y. Sept. 30, 2017) (quoting *Smiley v. E.I. Dupont De Nemours & Co.,* 839 F.3d 325, 330 (3d Cir. 2016)); *see* 29 C.F.R. § 778.223 ("Under the Act an employee must be compensated for all hours worked.").

The FLSA imposes requirements for both minimum wage and overtime wage.  The statute thus requires that any employee who is not statutorily exempt be paid at least the federal statutory minimum wage for the first 40 hours of work in a given week, 29 U.S.C. § 206(a), and that they receive "a rate not less than one and one-half times the regular rate at which he is employed" for overtime, or time worked in excess of 40 hours per week.  29 U.S.C. § 207(a)(1). "Under neither [the FLSA nor the NYLL] will a fixed salary be deemed to include an overtime component in the absence of an express agreement."  *Francois v. Mazer*, No. 09-cv-3275, 2012 WL 653886, at *4 (S.D.N.Y. Feb. 28, 2012) (citing *Wong v. Hunda Glass Corp.*, No. 09-cv-4402, 2010 WL 2541698, at *2 (S.D.N.Y. June 23, 2010)).

To establish liability under the FLSA for unpaid overtime, "'a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'"  *Campbell v. City of New York*, No. 16-CV-8719, 2020

WL 2792978, at *3 (S.D.N.Y. May 29, 2020) (quoting *Perry v. City of New York*, No. 13-CV-1015, 2018 WL 1474401, at *4 (S.D.N.Y. March 26, 2018)) (quoting *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011)).  "'[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours.'"  *Foster*, 2017 WL 11591568 at *17 (quoting *Kuebel*, 643 F.3d at 363).)  Any "'contrary conclusion would undermine the remedial goals of the FLSA.'"  *Id.* (quoting *Kuebel*, 643 F.3d at 364).

The FLSA allows workers to initiate collective actions to recover minimum and overtime wages for themselves and on behalf of similarly situated employees. *See* 29 U.S.C. § 216(b). The statute provides in pertinent part:

> An action … may be maintained against any employer … in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b).  Rather than merely being a procedural mechanism like a class action under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), § 216(b) of the FLSA establishes a "right" to employees to collectively join in an action.  *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 515 (2d Cir. 2020).

Additionally, designating a "collective" in an FLSA action differs from certification of a class action under Rule 23 in that potential FLSA collective members must affirmatively opt into, rather than opt out of, the litigation.  *See Lianhua Weng v. Kung Fu Little Steamed Buns Ramen Inc.*, No. 17-CV-273, 2018 WL 1737726, at *2-3 (S.D.N.Y. March 26, 2018) (discussing the differences between an FLSA collective action and a Rule 23 class action); *Contrera v. Langer*, 278 F. Supp. 3d 702, 713 (S.D.N.Y. 2017) (same).  Moreover, a proposed FLSA

collective need not meet the Rule 23 prerequisites of numerosity, typicality, commonality, and representativeness. *Bittencourt v. Ferrara Bakery & Cafe Inc.*, 310 F.R.D. 106, 111 (S.D.N.Y. 2015); *see also Lianhua Weng*, 2018 WL 1737726, at *2; *Contrera*, 278 F. Supp. 3d at 713.

## B.      The Two-Step Collective Certification Process

The FLSA itself "does not prescribe any procedures for approval of collective actions." *Contrera*, 278 F. Supp. 3d at 712 (citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169, 110 S. Ct. 482, 485 (1989)).  However, "district courts 'have discretion, in appropriate cases, to implement [Section 216(b) ] … by facilitating notice to potential plaintiffs' of the pendency of the action and of their opportunity to opt-in as represented plaintiffs." *Myers v. Hertz Corp.*, 624 F.3d 537, 554 (2d Cir. 2010) (alterations in original) (quoting *Hoffmann-La Roche*, 493 U.S. at 169, 110 S. Ct. at 486).  "Orders authorizing notice are sometimes referred to as orders 'certifying' a collective action, even though the FLSA does not contain a certification mechanism." *Contrera*, 278 F. Supp. 3d at 712 (citing *Myers*, 624 F. 3d at 555 n.10).

The Second Circuit has endorsed a two-step method used by district courts in determining whether to exercise their discretion to certify a collective action under Section 216(b) and to permit notice to be sent to potential opt-in plaintiffs. *Myers*, 624 F.3d at 554-55 (referring to the two-step process as "sensible"); *see also Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) ("In *Myers*, we endorsed a two-step process for certifying FLSA collective actions"); *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 660-61 (S.D.N.Y. 2013) (discussing and applying the two-step process); *Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 321 (S.D.N.Y. 2007) (same).

At the first step – the present stage of this litigation – a district court may "mak[e] an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers*, 624

F.3d at 555 (citing *Damassia v. Duane Reade, Inc.*, No. 04-CV-8819, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006)); *see also Hoffmann v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997) (same).  Thus, "[t]he threshold issue in deciding whether to authorize class notice in an FLSA action is whether plaintiffs have demonstrated that potential class members are 'similarly situated.'"  *Sbarro*, 982 F. Supp. at 261; *Islam v. LX Avenue Bagels, Inc.*, No. 18-cv-4895, 2019 WL 5198667, at *3 (S.D.N.Y. Sept. 30, 2019) (Lehrburger, J.) (same).

At the second stage of certification, which occurs at a future juncture that the instant case has not yet reached, "with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs."  *Glatt*, 811 F.3d at 540 (citing *Myers*, 624 F.3d at 555); *see Genxiang Zhang v. Hiro Sushi at Ollie's Inc.*, No. 17-CV-7066, 2019 WL 699179, at *5 (S.D.N.Y. Feb. 5, 2019) ("After discovery is complete, the court will evaluate the full record before it, in order to determine whether the opt-in plaintiffs are, in fact, similarly situated") (citing *Fasanelli*, 516 F.Supp. 2d at 321).  At the second stage, "[t]he action may be 'de-certified' if the record reveals that [the opt-in plaintiffs] are not [similarly situated], and the opt-in plaintiffs' claims may be dismissed without prejudice."  *Myers*, 624 F.3d at 555.

**C.    "Similarly Situated"**

"Neither the FLSA nor its implementing regulations define the term 'similarly situated.'" *Sbarro*, 982 F. Supp. at 261.  The Second Circuit, however, recently pronounced the standard for determining whether employees are similarly situated under the FLSA.  "[T]o be 'similarly situated' means that named plaintiffs and opt-in plaintiffs are alike with regard to some material aspect of their litigation. … That is, party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims."  *Scott*, 954 F.3d at 516.

The Second Circuit explained that the similarly situated requirement is a low bar, noting that "'the FLSA not only imposes a lower bar than Rule 23 [of the Federal Rules of Civil Procedure], it imposes a bar lower in some sense even than Rules 20 and 42, which set forth the relatively loose requirements for permissive joinder and consolidation at trial.'" *Id*. at 520 (quoting *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1112 (9th Cir. 2018)). In arriving at the standard, the court emphasized that the "goal in granting employees the right to proceed as a collective was to provide them 'the advantage of lower individual costs to vindicate rights by the pooling of resources' and thus achieve "'efficient resolution in one proceeding of common issues of law and fact ….'" *Id*. at 515-16 (quoting *Hoffmann-La Roche*, 493 U.S. at170, 110 S. Ct. at 486).

To further understand the similarly situated standard, it is helpful to consider the then-existing standard that the Second Circuit rejected. Before *Scott*, district courts had applied a flexible "ad hoc" approach based on three factors: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against collective action treatment." *Scott*, 954 F.3d at 517 (internal quotation marks and citation omitted). The Court Of Appeals found that approach problematic because it focused on "the ways in which the plaintiffs are factually disparate and the defenses are individualized" instead of "considering the ways in which the opt-in plaintiffs are similar in ways material to the disposition of their FLSA claims." *Id*. The Court expressed particular concern that the ad hoc approach "'invites courts to import, through a back door, requirements with no application to the FLSA,' like Rule 23(a)'s requirements of adequacy and typicality and Rule 23(b)(3) requirements of superiority and predominance."[10] *Id*. (quoting *City of Los Angeles*, 903 F.3d at

---

[10] The decision in *Scott* was not unanimous. The dissent would have adopted the ad hoc approach, and deemed the majority's "newly minted definition" of similarly situated too low a

1115).  Rule 23's requirement that common questions of law and fact "predominate" is quite distinct from and a "'much higher threshold'" than the similarly situated requirement of the FLSA.[11]  *Id*. at 518 (quoting *Myers*, 624 F.3d at 555-56).

## D.     Plaintiffs' Burden To Support Conditional Certification

To demonstrate that a collective should be conditionally certified, "[t]he burden on plaintiffs is not a stringent one, and the Court need only reach a preliminary determination that potential plaintiffs are 'similarly situated.'"  *Sbarro*, 982 F. Supp. at 261; *see also Hamadou*, 915 F. Supp. 2d at 661 (describing the burden as "very low" or "minimal") (quoting *Raniere*, 827 F. Supp. 2d at 319 and *Damassia*, 2006 WL 2853971 at *3).   "The leniency of this requirement is consistent with the broad remedial purpose of the FLSA."  *Morales v. Plantworks, Inc.*, No. 05-CV-2349, 2006 WL 278154, at *2 (S.D.N.Y. Feb.  2, 2006) (citing *Sbarro*, 982 F. Supp. at 262).

Plaintiffs can meet their burden at the conditional certification stage by "relying on their own pleadings, affidavits, declarations, or the affidavits and declarations of other potential class members."  *Hamadou*, 915 F. Supp. 2d at 661 (quoting *Raniere*, 827 F.Supp.2d at 319).  For this initial stage, courts "regularly rely on … hearsay statements."   *Salomon v. Adderley Industries, Inc.*, 847 F. Supp. 2d 561, 563 (S.D.N.Y. 2012).

That said, a plaintiff cannot satisfy their burden with "unsupported assertions," *Myers*, 624 F.3d at 555, or statements that are merely "conclusory."  *Morales*, 2006 WL 278154, at *2; *see*

---

bar in that it requires only "one or more" material issues of law or fact.  *Scott*, 954 F.3d at 522.

[11] Plaintiffs urge the Court to adopt the collective certification standard of a 2015 District of Colorado case, equating it with the standard for permissive joinder.  (Reply at 3-4.)  That is an odd request given that in the very next section of their moving brief, Plaintiffs cite *Scott*, issued in 2020, as "reaffirm[ing] the current standard at the collective certification stage."  (Reply. at 4-5.)  As explained above, *Scott* held that the correct standard for collective certification "imposes a bar ***lower*** in some sense" than the requirements for permissive joinder.  954 F.3d at 520 (emphasis added).

*also Huertero-Morales v. Raguboy Corp.*, No. 17-CV-2429, 2017 WL 4046337, at *3 (S.D.N.Y. Sept. 12, 2017) (denying conditional certification because plaintiff's statements regarding other employees were made in "only the most general terms and with scant factual support"); *Benavides v. Serenity Spa NY Inc.*, 166 F. Supp. 3d 474, 481 (S.D.N.Y. 2016) ("Conclusory allegations are not sufficient to support a motion for conditional collective action certification").

Importantly, "[i]n ascertaining whether potential opt-in plaintiffs are similarly situated" at the conditional certification stage, "courts should not weigh the merits of the underlying claims." *Hamadou*, 915 F. Supp. 2d at 662 (citing *Lynch v. United Services Automobile Association*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007); *see also Islam*, 2019 WL 5198667 at *4 (same). "At this procedural stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Lynch*, 491 F. Supp. 2d at 368; *see also Fasanelli*, 516 F. Supp.2d at 322 (the "preliminary documents" assessed at the first stage of certification "necessarily contain unproven allegations").

A plaintiff's factual allegations sometimes may be sufficient with respect to only a subset of employees within the proposed collective. In that event, "[c]ourts performing the collective action certification inquiry have discretion to certify a different group of individuals than that sought by the plaintiff." *Guan Ming Lin v. Benihana National Corp.*, 275 F.R.D. 165, 172 (S.D.N.Y. 2011); *see, e.g.*, *Genxiang Zhang*, 2019 WL 699179, at *7-8 (granting conditional certification but narrowing the job categories included in the collective); *She Jian Guo v. Tommy's Sushi Inc.*, No. 14-cv-3946, 2014 WL 5314822, at *4 (S.D.N.Y. Oct. 16, 2014) (same).

## E.   Application

One of the quintessential ways by which plaintiffs can establish a basis for collective certification is to make "a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law."

*Sbarro*, 982 F. Supp. at 261; *see also Myers*, 624 F.3d at 555 (same); *Kornblum v. Citigroup, Inc.*, 195 F. Supp.3d 475, 479 (S.D.N.Y. 2016) ("The key element of [the similarly-situated showing] is a shared unlawful policy").  That is precisely what Plaintiffs allege here.  Plaintiffs claim Urban illegally failed to pay its employees for all hours worked through two time-shaving practices:  by "surreptitiously" deducting hours of time worked, and by requiring employees to work off the clock.  Particularly given the Second Circuit's requirement that plaintiffs in a collective action need only share "a similar issue of law or fact material to the disposition of their FLSA claims," the Court readily concludes that – at this preliminary stage – conditional certification is warranted.  *Scott*, 954 F.3d at 516.

### 1.  Alleged Basis For Liability

To determine whether Plaintiffs and other employees are similarly situated, the Court first considers Plaintiffs' theories of liability.  *See Garcia v. Chipotle Mexican Grill, Inc.*, No. 16-CV-601, 2016 WL 6561302, at *4 (S.D.N.Y. Nov. 4, 2016) ("As a prerequisite to a collective action, the named plaintiff must demonstrate that he, himself, was a victim of the defendants' illegal pay practices") (internal quotation marks and citation removed).  Again, Plaintiff advances two theories: (1) Urban "surreptitiously" shaved hours, and (2) Urban supervisors and managers required employees to work off the clock.  As alleged, both theories are tied to Urban's Paylocity time-keeping system.

To begin, the misconduct alleged – time-shaving or not paying a non-exempt employee for all time worked – is a commonly invoked and legally cognizable basis for violation of the FLSA.  *See, e.g.*, *King v. FedCap Rehabilitation Services, Inc.*, No. 20-CV-1784, 2022 WL 292914, at *1-2, 4  (S.D.N.Y. Feb. 1, 2022) (granting conditional certification where plaintiff claimed employer rounded down hours worked and deducted hour for mealtimes even when employees did not take meal breaks); *Foster v. City Of New York, New York*, No. 14-CV-4142,

2020 WL 8173266 (S.D.N.Y. Oct. 30, 2020), *R. & R. adopted*, 2021 WL 1191810 (S.D.N.Y. Mar.30, 2021) (finding plaintiffs and putative collective members similarly situated where they alleged defendant failed to pay them for all pre-shift, post-shift, and mealtime work); *Garcia*, 2016 WL 6561302 at *10 (conditionally certifying "citywide collective action" where plaintiffs claimed they were subject to unlawful time shaving).

For instance, in *Foster*, employees of a New York City agency alleged "that the City failed to compensate Plaintiffs for work that they were suffered or permitted to work 'off-the-clock;' namely, before the official start time of their shifts, during their uncompensated meal periods and after the official end time of their shifts."  2020 WL 8173266 at *8.  The plaintiffs in *Foster* were subject to policies and time-keeping practices that are similar to those at issue here:  all employees were required to use a single time-keeping system known as CityTime and to obtain pre-approval for any time worked outside of regularly scheduled hours; the CityTime system automatically deducted one hour for meals; although the CityTime system enabled, and policy required, employees to submit their overtime hours through the CityTime system, not all employees did so; and plaintiffs did not receive compensation for non-pre-approved pre-shift, meal-period, and post-shift work about which supervisors and managers had knowledge.[12]  *Id.* at *4-5, 8.

To be clear, a time-keeping system such as Paylocity is not per se illegal.  *Zivali v. AT&T Mobility, LLC*, 784 F. Supp.2d 456, 461 (S.D.N.Y. 2011).  Nor, standing alone, is automatic deduction of break time or a requirement for an employee to obtain pre-approval for non-

---

[12] Courts in this District have uniformly granted conditional certification of other actions based on the same policies and practices encountered in *Foster*.  *See Campbell v. City of New York*, No. 16-CV-8719, 2020 WL 2792978 (S.D.N.Y. May 29, 2020); *Worley v. City of New York*, No. 17-C-4337, 2020 WL 915809 (S.D.N.Y. Feb. 26, 2020); *Adams v. City of New York*, No. 16-CV-3445, 2019 WL 5722054 (S.D.N.Y. Oct. 29, 2019), *R. & R. adopted*, 2020 WL 1031025 (S.D.N.Y. Mar. 3, 2020); *Perry v. City of New York*, No. 13-CV-1015, 2019 WL 1146581 (S.D.N.Y. Mar. 13, 2019).

scheduled work.  *See DeSilva v. North Shore-Long Island Jewish Health System, Inc.*, 27 F. Supp.3d 313, 321 (E.D.N.Y. 2014) ("Without more, a legal automatic meal deduction for previously scheduled breaks cannot serve as a common bound around which an FLSA collective may be formed"); *Zivali*, 784 F. Supp.2d at 461-62 (S.D.N.Y. 2011) (requirement that employees obtain pre-approval for all overtime not improper where employer had policy mandating payment for all overtime, regardless whether authorized).  Such policies and practices may be permissible, so long as employees have a means of obtaining pay for hours worked outside their shifts.  *See Foster*, 2020 WL 8173266 at *12 (distinguishing *DeSilva* and *Zivali*, in part, on that basis).  Based on facts presented at this juncture, Urban provides a means for employees to submit overtime hours for compensation; namely, the comment feature of Paylocity and the opportunity to review timecards.  Plaintiffs thus have no claim for a violation of the FLSA based solely on how Paylocity operates.

But that is not the end of the inquiry.  An employer must still pay an employee for unapproved non-shift work if the employer has "actual or constructive knowledge" that such work is being performed and employees are not being compensated for it.  *Campbell*, 2020 WL 2792978 at *3.  That remains so even if an employee is at fault for not using features of the pay system that would otherwise ensure payment for all hours.  "'[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours.'"  *Foster*, 2017 WL 11591568, at *6 (S.D.N.Y. Sept. 30, 2017) (quoting *Kuebel*, 643 F.3d at 363).)

Here, based on the allegations, declarations, and evidence currently before the Court, Urban had such knowledge throughout its enterprise.  Urban's timekeeping system captured for each employee any discrepancies in their scheduled hours and their clocked-in and clocked-out hours.  Similarly, Urban had information about the number of hours for which each

employee was paid.  Urban thus had data available to it, as shown in the time records submitted by Plaintiffs, potentially to put it on notice that employees were not being paid for all hours.  If that proves to be the case, then Plaintiffs have a viable theory of "surreptitious" deduction of hours.  Moreover, apart from the data captured by Paylocity and available to Urban, both Tueros and Lopez attest that they affirmatively complained to supervisors and managers about their uncompensated hours thus providing Urban with another source of knowledge of failing to fully compensate its employees.  (Robb Decl. Ex. Dkt. 40-E ("Tueros Depo.") at 39, 45, 50; 40-F ("Lopez Depo.") at 19-20, 23-25.)  Yet, according to both Tueros and Lopez, their supervisors and managers did not make sure that their hours were properly adjusted and compensated. (Tueros Depo. at 39, 42; Lopez Depo. at 20-21, 26-27, 31-32.)

Plaintiff's second theory of liability is that Plaintiffs and other employees were required by their supervisors and managers to work before punching in, after punching out, and during mealtime when they were not clocked in.  That theory is different than the "surreptitious" theory in that it is premised on supervisors and managers preventing employees from providing the information that Paylocity needed to capture discrepancies between an employee's schedule and their clocked-in and clocked-out times.  In such instances, employees would not even have the opportunity to provide comments addressing discrepancies.  This theory of liability, if supported, is straight-forward; requiring employees to work "off the clock" violates the FLSA. *Guan Ming Lin*, 275 F.R.D. at 72 ("employers are prohibited from requiring employees to perform uncompensated, or 'off-the-clock' work") (citing, inter alia, 29 U.S.C. §§ 206(a), 207(a)).

Having examined Plaintiff's theories of liability, the Court now turns to the similarly situated inquiry.

### 2.    The Similarly Situated Requirement Is Met At This Preliminary Stage

Plaintiffs and other non-exempt Urban employees are similarly situated with respect to the "surreptitious" theory; i.e., that Urban knew that it was not fully compensating its employees for pre-shift, post-shift, or mealtime hours.  Multiple data points support that conclusion.

First, as noted above, the two named Plaintiffs, Lopez and Tueros, each attest to having not been paid for all their pre-shift, post-shift, and mealtime hours and that their supervisors were aware and did not resolve the problem.  A non-conclusory declaration from one plaintiff may, depending on the circumstances, be enough to establish the basis for conditional certification.  *Hernandez v. Bare Burger Dio Inc.*, No. 12 Civ. 7794, 2013 WL 3199292, at *3 (S.D.N.Y. June 25, 2013) ("courts in this circuit have routinely granted conditional collective certification based solely on the personal observations of one plaintiff's affidavit") (collecting cases).  Here, the two named plaintiffs attest to facts that corroborate each other, indicating they were subject to the same policies and practices.  See *Islam*, 2019 WL 5198667, at *6 ("both Islam and Siddik have provided declarations attesting to the policy applied to the other employees; in other words, each corroborates the other, which creates a firmer foundation"); *Garcia v. Spectrum of Creations*, 102 F. Supp.3d 541, 548-49 (S.D.N.Y. 2015) ("Here, of course, there are two employees who corroborate each other's personal treatment and observations of the treatment of other employees").  Moreover, they each were deposed and provided testimony backing up and expanding on their declarations.  (*See, e.g.,* Lopez Depo. at 14-15, 19-21, 23-27, 31-32; Tueros Depo. at 38-50.)

Second, in addition to the testimony of the two named plaintiffs, Rodriquez, a plaintiff against Urban in another case, attests to being subject to similar policies and procedures and not being compensated for all her time worked beyond her regularly scheduled hours. (Rodriguez Decl. ¶¶ 5-9.)  The record thus contains direct testimony from three non-exempt

employees confirming their being subject to the same policies and procedures contributing to their not being fully paid in compliance with the FLSA.

Third, each of the Plaintiffs identifies other employees with whom they discussed not being paid for all pre-shift, post-shift, or mealtime hours. Each identifies several such employees by name, either in part or in whole. Each identifies the positions of those employees. And each provides some details that make their assertions about other employees more than just conclusory.[13] For instance, Lopez describes an incident in which he and a co-worker named Rafael were asked to cut down a tree and "get rid of a rodent problem" after clocking out and were not paid for that time. (Lopez Decl. ¶ 11; *see also* Lopez Depo. at 51-72.) Rodriguez explains how she and a co-worker, Diana Suarez, sometime drove home together in the same car after work and complained to each other about not getting paid for work outside regular shift hours; she similarly explains how she and a co-worker, "Marlene," frequently took the train together and similarly complained to each other about "missing wages" and unpaid work time during lunch breaks. (Rodriguez Decl. ¶¶ 10-11.) That is not to say that Plaintiffs provide specifics of conversations for each of the employees they claim to have spoken with about uncompensated time. They do not. But taken together, there is enough to nudge Plaintiffs across the "modest" threshold required for conditional certification.

Fourth, Plaintiffs have submitted time and pay records both showing the hours for which they were not compensated and providing evidence that Urban knew, actually or constructively,

---

[13] The examples and specifics provided by Plaintiffs about the basis for their knowledge of other employees distinguishes this case from those cited by Urban where courts found general statements of an employee's having had conversations with other employees insufficient to support conditional certification. *See Kwan v Sahara Dreams Co. II Inc.*, No. 17-CV-4058, 2020 WL 10575397, at * 6 (S.D.N.Y. May 5, 2020), *R. & R. adopted in part*, 2021 WL 2843100 (S.D.N.Y. July 5, 2021); *Zamora v. L Plus L Productions LLC*, No. 19-CV-1506, 2019 WL 5460559, at * 4 (S.D.N.Y. Oct. 15, 2019); *Guo v. Tommy's Sushi Inc.*, No. 14-CV-3946, 2014 WL 5314822, at *3 (S.D.N.Y. Oct. 16, 2014).

that employees were not being fully compensated for all their time worked.  Taken together, these varied evidentiary sources support a finding that Plaintiffs and other employees are similarly situated.  *See King v. FedCap*, 2022 WL 292914 at *5 (granting conditional certification in time shaving case based on plaintiff's declaration attesting to conversations with other employees who suffered same violations; declaration from a former employee attesting to suffering same violations; and timesheets showing Plaintiff's and other workers' hours).

Plaintiffs have also provided enough evidence for conditional certification of a collective spanning all of Urban's non-exempt employees.  First, each Plaintiff held a position different than the other:  handyman (Lopez), receptionist, patient service representative, and community health worker, (Tueros), phlebotomist (Rodriquez), thus indicating that the alleged pay practice applied across varied positions.  Second, the employees they identify as having been subject to the same policies and practices held positions like theirs, as well as additional positions, including nurses and medical assistants.  (*See* Lopez Decl. ¶ 6; Tueros Decl. ¶ 2; Rodriguez Decl. ¶ 3.)

Similarly, Plaintiffs have provided enough evidence for conditional certification of a collective spanning all of Urban's locations.  To be sure, most of the evidence submitted concentrates on personnel primarily based out of the Plaza Del Sol location.  That is where each of the three Plaintiffs were based for all or most of their tenure, and the other employees identified by Tueros and Rodriguez worked entirely or primarily at Plaza Del Sol.  But there is more.  While Lopez primarily worked at Plaza Del Sol, he also worked regularly at many of Urban's other locations.  (Lopez Decl. ¶ 1.)  The other employees that Lopez identifies as being subject to the same policies and practices worked at other locations (such as El Nuevo and Tres Puentes), while most of the other handymen he identified worked at all locations.  (Lopez Decl. ¶ 6.)  Two of the medical assistants identified by Rodriguez worked at all locations as

needed.  (Rodriguez Decl. ¶ 3.)  And Urban concedes that its timekeeping practices and policies apply to all locations throughout its network.  (Robb Decl., Ex. Dkt. 40-18 ¶ 3; Baez Depo. at 15.)    "In the Second Circuit, courts routinely find employees similarly situated 'despite not occupying the same positions or performing the same job functions and in the same locations, provided that they are subject to a common unlawful policy or practice.'"  *King v. Fedcap*, 2022 WL 292914 at *7 (quoting *Balverde v. Lunella Ristorante, Inc.*, No. 15-CV-5518, 2016 WL 2757430, at *4 (S.D.N.Y. May 11, 2016) (quoting *Guaman v. 5 M Corp.*,No. 13-CV-3820, 2013 WL 5745905, at *4 (S.D.N.Y. Oct. 23, 2013)).

Plaintiffs thus have established that they and other Urban employees are similarly situated with respect to Plaintiffs' "surreptitious" theory of liability.  However, whether Plaintiffs and other employees are similarly situated with respect to Plaintiffs' second theory – that they were ***required*** to work without pay off-the-clock – is not as clear.  Each of the named Plaintiffs state in conclusory fashion in their declarations that they were "required" to work off the clock without receiving pay for that time.  Their deposition testimony, however, is not as consistent. For example, Tueros testified that no one ever told her that she had to punch out and continue working and that working off the clock was only an issue with her supervisor at Plaza Del Sol, not other supervisors.  (Tueros Depo. at 38, 76).  Rodriquez testified similarly.  (Rodriquez Depo. at 66-69.)  Were Plaintiffs' "required" theory their only theory of liability, the Court would have difficulty in finding that they are similarly situated to other Urban employees.

But Plaintiffs' first theory is enough to warrant conditional certification.   Urban's possession of data and information – and either actual or constructive knowledge – that various employees were not paid for all hours worked is a highly "material aspect of [the] litigation" through which Plaintiffs and other employees "share a similar issue of law or fact material to the disposition of their FLSA claims."  *Scott*, 954 F.3d at 516; *see King v. Fedcap*, 20-22 WL

24

292914 at *8 (although "Plaintiff has failed to submit sufficient evidence to show that he and the collective are similarly situated regarding the allegations that Defendants failed to compensate employees for time spent traveling to other sites," "it does not affect my decision to grant conditional certification" based on rounding-down and time-shifting theories).

### 3.  Urban's Opposing Arguments Do Not Forestall Conditional Certification

Urban advances two principal arguments as to why Plaintiffs are not similarly situated with other Urban employees.  First, Urban contends that the reason Plaintiffs were underpaid is their own fault because they did not record in Paylocity's comment feature the extra hours they worked.  (Def. Mem. at 6, 13.)  Each Plaintiff did record some comments in Paylocity, which indicates that they knew how to use the system.  Yet Plaintiffs either did not register comments about unrecorded pre-shift time (Lopez), mostly logged comments explaining why they missed clock-in punches (Tueros), or registered only a limited number of comments (Lopez, Tueros, and Rodriguez).  (*Id.*)  That argument is beside the point.  The commonality, among Plaintiffs and other employees is their not being paid for all extra hours and Urban's knowledge of that deficit.  That Plaintiffs actions or lack of action may have contributed to their being undercompensated does not render them insufficiently similarly situated.

As support for its argument, Urban cites to *Zivali*, a case in which certain AT&T workers made claims like those here that they were not paid for all pre-shift, post-shift, or mealtime work.  *See* 784 F. Supp.2d at 460-61.  Urban highlights that the "MyTime" timekeeping system in *Zivali*, like Urban's Paylocity system, could capture all off-the-clock work through proper reporting and the system's adjustment feature; that the court "questioned plaintiffs' individual 'use of the adjustment feature' when opt-in plaintiffs testified 'they regularly received payment for work reported through the adjustment feature;'" and that certification was unwarranted

because plaintiffs did not demonstrate that defendant's lawful policies were consistently violated in practice.   (Def. Mem. at 13, quoting *Zivali,*784 F.Supp.2d at 467.)

Urban overlooks two important aspects of *Zivali*.   First, *Zivali* was a decision as to whether an already-certified collective should be decertified.  The court previously had **granted** conditional certification. 784 F. Supp.2d at 459.  It was only after opt-in plaintiffs joined the action and substantial discovery was taken that the court confronted a record demonstrating that collective certification could no longer be supported.  Second, the employer in *Zivali* had a policy that all overtime had to be paid, whether authorized or not, even though company policy required employees to obtain pre-approval for off-the-clock work.  784 F. Supp.2d at 461-62.  An employee could be disciplined for not adhering to policy, but the employee still had to be compensated for the work done.  *Id.*  Urban has not pointed the court to a similar policy.  It may be that, as in *Zivali*, a collective no longer will be supported at the second stage of certification.  But at this preliminary stage, the requirements for conditional certification are met.

Second, Urban argues that Plaintiffs have failed to connect their claims to any broader group because the circumstances of their under-compensation are unique to each of them. (Def. Mem. at 7-8, 12-13; Def. Supp. at 1-3.)  Urban thus points to Lopez's deposition testimony in which he agreed that his "getting skimmed" because he had to come in early to open up the Plaza Del Sol location was an issue specific to him.  (Def. Mem. at 7, citing Lopez Depo. at 49-50.)   Urban ignores, however, testimony just pages later where Lopez testified that other employees complained of similar issues at locations other than Plaza Del Sol.  (Lopez Depo. at 52-53.)  Urban also does not account for the other time periods and ways in which Lopez was undercompensated; namely, working through mealtime and after his shift ended without compensation – practices common to the other Plaintiffs and to other employees identified by the Plaintiffs.

As for Tueros, Urban cites to deposition testimony suggesting that uncompensated time was only an issue for her with respect to one supervisor, not others.  (Def. Mem. at 7-8, citing Tueros Depo. at 76.)  Urban again cherry-picks the evidence, ignoring Tueros' assertions about not being compensated for automatically deducted mealtime hours.  (Tueros Decl. ¶¶ 3-4.)  To the extent Tueros' deposition and declaration testimony may be inconsistent, that raises a credibility issue, which the Court does not resolve on a motion for conditional certification.  *See Lijun Geng v. Shu Han Ju Restaurant II Corp.*, 2019 WL 4493429, at \*11 (S.D.N.Y. Sept. 9, 2019) ("The Court is not prepared to make a finding as to the credibility of any Plaintiff's (or any Defendant's) factual assertions at this stage of certification"); *Hamadou*, 915 F. Supp. 2d at 664 ("Courts do not resolve factual disputes or make credibility determinations at the conditional certification stage").

Urban points to similar testimony from Rodriguez in which she identified only her specific supervisor as requesting her to keep working after punching out.  (Def. Mem. at 8, citing Rodriguez Depo. at 69.)   But that addresses only Plaintiff's "required" theory, which, as explained above, the Court agrees by itself likely would not support conditional certification. The excerpted testimony does not, however, detract from the commonality of Plaintiff's other liability theory.

Urban also points to the unrebutted testimony of its managers and payroll department personnel that "time entries are handled at the department level by individual managers, not by the Payroll Department" and that the handful of managers that submitted declarations attested to their individual efforts "to verify that all hours worked are paid."  (Def. Supp. at 2-3.)  That argument, however, ignores the payroll data submitted by Plaintiffs that indicates that Urban had at least constructive notice that its employees were not receiving payment for all hours worked.  It also eschews the Plaintiffs' attestations to other employees who believe they were

not paid for all hours worked.

In short, Urban focuses on what differentiates Plaintiffs and other employees, not what they share in common with respect to uncompensated work hours.  In doing so, Urban engages in what *Scott* proscribes – focusing on "the ways in which the plaintiffs are factually disparate and the defense are individualized" instead of "considering the ways in which the opt-in plaintiffs are similar in ways material to the disposition of their FLSA claims."  954 F.3d at 517.  While Plaintiffs and other employees no doubt are not identical in all material respects, they present common issues of law and fact material to the disposition of their claims.[14]

Having determined that conditional certification is warranted, the Court next discusses Plaintiffs' requests for approval of their proposed notice, discovery of employee contact information, and equitable estoppel of the statute of limitations.

## II.  Opt-In Notice

Once a court finds that a named plaintiff has satisfied his or her burden at the conditional certification stage, it "may proceed to authorize issuance of a notice informing potential additional plaintiffs of their opportunity to opt into the lawsuit."  *Liping Dai*, 2018 WL 4360772 at *5 (citing *Lynch*, 491 F. Supp. 2d at 367).  Although the FLSA itself "has no provision for issuing notice in a collective action, it is 'well settled' that district courts have the power to authorize an FLSA plaintiff to send such notice to other potential plaintiffs."  *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 101, 104 (S.D.N.Y. 2003) (quoting *Sbarro*, 982 F. Supp. at 261).  No authority "ha[s] specifically outlined what form court-authorized notice should take nor what provisions the notice should contain."  *Fasanelli*, 516 F. Supp. 2d at 323

---

[14] Urban suggests that there are other of its employees who in fact have been paid for all hours. That may well be so.  But in those instances, the employees would have suffered no compensable injury.  And if discovery shows that Plaintiffs and other employees do not sufficiently share issues of fact or law material to disposition of the case, then it may be appropriate to decertify the collective at the second certification stage.

(noting also that in *Hoffmann La-Roche*, the Supreme Court "abstained from reviewing the contents of a proposed notice under § 216(b)"). District courts thus possess "broad discretion," to "monitor[ ] preparation and distribution of the [n]otice to ensure that it is timely, accurate, and informative." *Guo v. Tommy's Sushi*, 2014 WL 5314822 at *4 (first alteration in original) (internal quotations omitted) (quoting *Hoffmann La-Roche*, 493 U.S. at 172, 110 S. Ct. at 487). In utilizing their discretion to approve the details of notice, "courts should consider the overarching policies of the notice provisions of Section 216(b) … which include achieving judicial efficiency and lowering individual costs for plaintiffs." *Liping Dai*, 2018 WL 4360772 at *6 (citing *Fasanelli*, 516 F. Supp. 2d at 323).

Here, Plaintiffs have proposed a form of notice attached as Exhibit A to the Lee Declaration. Defendant has not challenged the form and content of the notice proposed by Plaintiffs except with respect to the time period designated for eligible opt-in plaintiffs. Plaintiffs' proposed notice applies a six-year time period starting as of May 19, 2015. Defendant argues that the proper time period is three years. The Court agrees with Defendant.

The statute of limitations under the FLSA is two years, but is extended to three years in cases where, as here, willful misconduct is alleged. 29 U.S.C. § 255(a). District courts thus "routinely" apply the three-year statute of limitations to the notice period when plaintiffs plead a willful violation of the FLSA. *Cohen v. Gerson Lehrman Group, Inc.*, 686 F. Supp. 2d 317, 331 (S.D.N.Y. 2010); *see, e.g.*, *Vasto v. Credico (USA) LLC*, No. 15-CV-9298, 2016 WL 2658172, at *16 (S.D.N.Y. May 5, 2016) (approving a three-year limitations period in defining the scope of notice because plaintiffs alleged a willful violation of the FLSA). Notwithstanding this "routine" practice, some courts have approved six-year limitation periods where, as here, plaintiffs have asserted claims pursuant to both the FLSA and NYLL. *See, e.g., Fonseca v. Dircksen & Talleyrand, Inc.*, No. 13-CV-5124, 2014 WL 1487279, at *6 (S.D.N.Y. April 11, 2014) (approving

request for six-year notice period); *Winfield v. Citibank, N.A.*, 843 F. Supp.2d 397, 410 (S.D.N.Y. 2012) (same).

Other courts, however, approve only the three-year period, which is "the maximum time period to join an FLSA collective action." *Garcia*, 102 F. Supp.3d at 551; *accord Romero v. La Revise Associates, LLC*, 968 F.Supp.2d, 639, 648-49 (S.D.N.Y. 2013) (distinguishing three-year period under FLSA from six-year period under NYLL and rejecting plaintiff's request to apply six-year period); *Ramos v. Platt*, No. 13-CV-8957, 2014 WL 3639194, at *4 (S.D.N.Y. July 23, 2014) (rejecting six-year period in favor of three-year period). After all, the NYLL does not provide for a collective action as distinct from a class action, which is a different procedure with different requirements. *See Alvarez v. IBM Restaurants Inc.*, 839 F. Supp.2d 580, 587 (E.D.N.Y. 2012) ("To the extent the Plaintiffs seek to provide notice to potential plaintiffs that fall outside of the putative FLSA class, but may have claims under the N.Y. Labor Law, they must follow discovery and notice procedures applicable to class actions under the Federal Rules of Civil Procedure.").

Where, as here, no class action has been certified pursuant to Fed. R. Civ. P. 23, "[i]t would be confusing to employees who are ineligible for the FLSA opt-in class to receive the opt-in notice, which does not relate to any state law claims." *Hamadou*, 915 F. Supp.2d at 668; *see also Ramos*, 2014 WL 3639194 at *4 (finding argument that six-year notice period will cause confusion is more persuasive than argument that using the longer period is more economical). Accordingly, the Court approves only a three-year notice period for the collective action, and the notice must be revised consistent with that limitation.

Although Defendant does not raise concerns about the specific wording of the proposed notice, the Court believes that certain edits are warranted in order to avoid undue repetition and confusion as well as to correct certain typographical errors. Specifically, the first two non-

bold paragraphs should be revised to read:  "Former employees CHRISTINA TUEROS and HERMEL LOPEZ ("Plaintiffs") have sued URBAN PLAN, INC. ("Urban Plan" or "Defendant"), for (1) compensation for unpaid off-the-clock work, including unpaid overtime wages, (2) liquidated damages, and (3) attorney's fees and costs pursuant to the Fair Labor Standards Act ("FLSA").  The purpose of this Notice is to advise you of your right to participate in this lawsuit under the FLSA."  Additionally, the following clause appearing at the end of the paragraph beginning "If you do not join the lawsuit…" should be deleted: "and the statute of limitations under the NYLL is six years from the date of the violation."

Revisions also are warranted for the "Consent To Sue" form.  In addition to revising the applicable time period, the following clause should be added after "present," and before "complete" in the second to last line of the first paragraph: "and wish to participate in this lawsuit."

### III.    Discovery Of Employee Contact Information

Upon granting collective certification, "[c]ourts in this Circuit routinely grant [plaintiff's] motions to compel production" of certain contact information for "potentially similarly situated employees who may wish to 'opt-in' to a collective action."  *Hong v. Haiku@WP Inc.*, 2022 WL 263575, at *8 (S.D.N.Y. Jan. 28, 2022) (quoting *Anglada v. Linens 'N Things, Inc.*, No. 06-CV-12901, 2007 WL 1552511, at *7 (S.D.N.Y. Apr. 26, 2007) (collecting cases), *R. & R. adopted* (May 22, 2007)).  Here, Plaintiffs request that Defendant produce "a list of all Covered Employees in Excel format who were employed by Defendant at any point in the six years prior to the entry of [this order] with the following information:  names, Social Security numbers, titles, compensation rates, last known mailing addresses, email addresses, all known telephone numbers and dates of employment."  (Pl. Mem. 20.)  Defendant opposes the request as overbroad in two respects.  The Court agrees.

First, as discussed above, the proper time-period is three years, not six years. Defendant thus need only produce information for employees covering the period three years prior to entry of this order.

Second, the information that Plaintiffs seeks about each employee is overly evasive and includes information unnecessary for distribution of notice. Such "out-of-bounds" information typically includes social-security numbers and rates of compensation. *See King v. FedCap,* 2022 WL 292914, at *11-12 (S.D.N.Y. Feb. 1, 2022) (denying production of social security numbers and compensation rates, and stating "Courts in this Circuit have limited the scope of requests for contact information in collective FLSA if production of the information is unnecessary or unduly invasive of employees' privacy") (collecting cases). Plaintiffs assert that they need social security numbers to be able to perform skip traces on employees whose contact information is out of date. The Court does not find that speculative concern sufficient to outweigh the strong privacy interest in an individual's social security number. Moreover, concern for unreachable employees is reduced by the various means by which notice may be distributed (email, post mail, et al.). Accordingly, although Defendant will be required to produce the contact information requested, that information need not include social security numbers or compensation rates.

### IV.    Equitable Tolling

Plaintiffs also ask the Court to issue an order tolling the statute of limitations for all potential opt-in plaintiffs "until such time that [Plaintiffs] are able to send notice to potential opt-in plaintiffs."  (Pl. Mem. 21.)  Defendant opposes this request on the grounds that Plaintiffs "have not identified any extraordinary circumstances that warrant a tolling of the statute of limitations."  (Def.. Opp. 17.)  The Court agrees with Defendant.

"Equitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances."  *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citing *Bowers v. Transportacion Maritima Mexicana, S.A.*, 901 F.2d 258, 264 (2d Cir. 1990)).  The Second Circuit has cautioned that "equitable tolling is considered a drastic remedy applicable only in 'rare and exceptional circumstance[s],'" *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (alteration in original) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)), "where a plaintiff has been 'prevented in some extraordinary way from exercising his rights.'"  *Johnson*, 86 F.3d at 12 (quoting *Miller v. International Telephone and Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir. 1985), *cert. denied*, 474 U.S. 851, 106 S. Ct. 148 (1985)).

In the context of conditional certification under the FLSA, equitable tolling "might apply ... where the defendant has concealed the existence of a cause of action from the plaintiffs." *Mark v. Gawker Medica LLC*, No. 13-CV-4347, 2014 WL 5557489 at *2 (S.D.N.Y. Nov. 3, 2014); *see also Viriri v. White Plains Hospital Medical Center*, 320 F.R.D. 344, 355 (S.D.N.Y. 2017) ("The most common circumstance where equitable tolling might apply to FLSA actions is where the defendant has concealed the existence of a cause of action from the plaintiffs").  Courts have also equitably tolled the FLSA statute of limitations in cases where "courts' heavy dockets

and understandable delays in rulings" could time bar opt-in plaintiffs "whose putative class representatives and their counsel are diligently and timely pursuing the[ir] claims." *McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 444-45 (S.D.N.Y. 2012); *accord Contrera*, 278 F. Supp. 3d at 724 ("the test for equitable tolling is not concerned with the diligence of a plaintiff who has already timely filed a claim, but rather with the diligence of a plaintiff who is seeking the application of the doctrine").

Courts in this district have not agreed upon any standard length of delay that warrants equitable tolling. *Compare Viriri*, 320 F.R.D. at 355-56 (granting equitable tolling due to six-month period between fully briefed motion for conditional certification and court's order), and *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170-71 (S.D.N.Y. 2014) (declining to adopt a "piecemeal approach" and granting equitable tolling when "more than seven months" had elapsed between fully briefed motion and court's order), with *Vasto*, 2016 WL 2658172 at *16 (court's five-month delay "not of a magnitude that would justify tolling"), and *Mark*, 2014 WL 5557489 at *3 (court's 11-month delay not sufficiently "extraordinary" to warrant equitable tolling).

The Court does not find that this case merits categorical equitable tolling of the statute of limitations for potential opt-in plaintiffs. Other than contending that "courts in this and other Circuits have increasingly granted requests for equitable tolling," Plaintiffs do not point to any facts specific to this case that would warrant application of the doctrine. (Pl. Mem. 21.) Plaintiffs have not identified any "rare and exceptional" aspects of the case to justify equitable tolling. *A.Q.C. ex rel. Castillo*, 656 F.3d at 144 (quoting *Smith*, 208 F.3d at 17). Moreover, Plaintiffs have not alleged that Defendants actively "concealed the existence of a cause of action from the [opt-in] plaintiffs." *Mark*, 2014 WL 5557489 at *2. Nor have Plaintiffs offered specific details as to any individual potential opt-in plaintiff who intends to join the collective but who risks

becoming time-barred or has been "prevented in some extraordinary way from exercising his rights." *Johnson*, 86 F.3d at 12 (quoting *Miller*, 755 F.2d at 24); *see, e.g., Liping Dai*, 2018 WL 4360772, at *12 ("Plaintiffs have not demonstrated that the claims of any potential opt-in plaintiffs would actually be barred") (citing *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 767 F. Supp. 2d 445, 450 (S.D.N.Y. 2011); *Contrera*, 278 F. Supp. 3d at 724 ("The plaintiffs on whose behalf equitable tolling is being sought have not been identified.... no specific information has been provided about any particular opt-in plaintiff's circumstances. Thus, this Court cannot assess whether any potential opt-in plaintiff has diligently pursued his or her rights.")

Further, the Court's "understandable delay in ruling[ ]," *McGlone*, 867 F. Supp. 2d at 445, in this case does not constitute a "substantial gap," *Viriri*, 320 F.R.D. at 355, under any of the benchmarks set forth above.  As of the date of this order, ten months have passed since the filing of Plaintiffs' motion.  To the extent that this period of time could be construed as exceptional (which it is not), such delay was necessitated in part by Plaintiffs' seeking discovery from Defendant (who submitted declarations opposing the motion for conditional certification) and then filing supplemental briefing.  *Cf. Vasto*, 2016 WL 2658172, at *16 (noting that delay resulting from plaintiffs' self-initiated transfer of case to this district "was [not] beyond plaintiffs' control").  In short, the Court finds no basis to invoke equitable estoppel as to all potential opt-in plaintiffs.  At the second stage of certification, if it becomes apparent that equitable tolling arguments apply to individual plaintiffs who have opted into this litigation, the Court can timely address those issues.  *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 564 n.14 (S.D.N.Y. 2013).

## Conclusion

For the foregoing reasons, (1) Plaintiffs' motion to conditionally certify an FLSA collective action is GRANTED; (2) Within 14 days of this order, Defendant shall produce a list, in

electronic format, of all covered employees, who were employed by Defendant at any point in the three years prior to the entry of this order, with each employee's name, titles, dates of employment, last known mailing addresses, email addresses, and telephone number; (3) Plaintiffs shall revise the proposed form of Notice Of Pendency consistent with the revisions designated above.  Plaintiffs' motion is DENIED in all other respects.  The parties shall meet and confer regarding timing and procedures for distributing the Notice and shall file a proposal with the Court by August 4, 2022.

**SO ORDERED.**

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  July 14, 2022
        New York, New York

Copies transmitted to all counsel of record.